NO. 4-01-0352 

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

MARS, INCORPORATED, and

KAL KAN FOODS, INC.,

Plaintiffs-Appellants,

v.

HERITAGE BUILDERS OF EFFINGHAM, INC.,

         Defendant,

         and

GF GENERAL CONTRACTORS, INC.,

Defendant-Appellee.

)

)

)

)

)

)

)

)

)

Appeal from

Circuit Court of 

Coles County

No. 97L33

Honorable

Gary W. Jacobs,

Judge Presiding.

JUSTICE KNECHT delivered the opinion of the court:

In early 1995, plaintiffs, Mars, Inc., and Kal Kan Foods, Inc. (collectively Kal Kan), initiated a warehouse expansion project.  Kal Kan's general contractor engaged GF General Contractors, Inc. (GF), to erect a steel-frame system (frame) that would eventually support the building.  According to Kal Kan, the frame was the property of Kal Kan when GF undertook to erect it.  The frame collapsed in June 1995 in the early stages of construction after a violent thunderstorm, and in February 1998, Kal Kan brought suit against GF for negligence in failing to properly brace the frame.  GF sought dismissal on the grounds that the negligence claim was barred by the economic-loss doctrine of 
Moorman Manufacturing Co. v. National Tank Co.
, 
91 Ill. 2d 69, 81, 435 N.E.2d 443, 448 (1982)
. 
 In June 2000, the trial court reconsidered an earlier ruling, agreed, and dismissed the claim.  Kal Kan appeals.  We affirm.

I. BACKGROUND

Kal Kan operates a dog and cat food manufacturing plant and warehouse in Mattoon.  In early 1995, Kal Kan solicited bids for construction of a 60,000-square-foot warehouse expansion.  Among the contractors submitting bids was defendant Heritage Builders of Effingham (Heritage), which was awarded the contract on March 15, 1995.

In early April 1995, Heritage began construction and subcontracting portions of the work to various subcontractors.  Among these was defendant GF, engaged by Heritage to erect the steel-frame system that would eventually support the warehouse building.  Kal Kan was not a party to this subcontract.

According to Kal Kan, the steel-frame system GF was to erect already had been purchased from another entity and was, at the time of erection, Kal Kan's property.  Pursuant to its subcontract with Heritage, GF was to "unload and erect" the frame.  According to Kal Kan, "GF was hired simply to erect the frame that Kal Kan had independently purchased, and not to supply any of the components."

Nevertheless, Kal Kan's initial purchase order to Heritage stated that Heritage was to "provide materials, labor, equipment, engineering, and supervision to construct a warehouse."  Attached to this purchase order was an addendum that provided Heritage must "furnish all of the materials and perform all the labor necessary" to construct the warehouse.  Further incorporated into the purchase order was a project manual for the work, which included design and materials specifications for the structural steel.

Regardless of the true owner of the frame, GF began erecting the frame on May 30, 1995.  As of June 9, 1995, GF had erected between 70% and 85% of the frame, bracing it with temporary cable bracing.  GF did not installed any permanent angle or cross-bracing.  According to Kal Kan, the temporary bracing GF installed did not meet the applicable building code wind-load requirements and project specifications.

During the early morning of June 10, 1995, a severe thunderstorm passed through Mattoon, causing the frame to suddenly collapse.  As result of this collapse, the frame was irreparably damaged, necessitating the purchase of a new steel-frame system.  This resulted in an eight-week delay in the completion of the warehouse.

In April and October 1997, Kal Kan filed complaints against Heritage in Coles County circuit court, alleging a single breach of contract count.  On February 19, 1998, Kal Kan amended its complaint and added a negligence count against GF, alleging that GF negligently failed to properly erect and brace the frame, thereby causing its collapse during the storm.

In May 1998, GF moved to dismiss this portion of the complaint, arguing such claims were barred by the economic-loss doctrine set forth in 
Moorman
.  Holding that the economic-loss doctrine did not bar the negligence claim, Judge Paul C. Komada, the judge then presiding, denied GF's motion.  Specifically, Judge Komada held the frame that collapsed was not GF's "product" for purposes of the 
Moorman
 doctrine.  Rather, GF's "product" was the service of erecting the frame.  As such, Judge Komada held, the 
Moorman
 doctrine did not bar Kal Kan's complaint.  Both parties agreed Judge Komada's ruling from the bench denying GF's motion would stand as a docket entry and no written order would issue.

On August 10, 1998, GF filed its answer to the then-pending third-amended complaint, including an affirmative defense that the negligence claim was barred by 
Moorman
.  Fifteen months later, GF filed a third-party complaint against Allen Engineering Corporation (Allen), the manufacturer of the frame, alleging Allen was negligent in its work on the design of the frame, as well as its bracing and anchoring.  Allen responded with a motion to dismiss the third-party complaint as being barred by 
Moorman
, making the same substantive argument GF had made in its motion to dismiss Kal Kan's negligence claim against GF.

With the 
Moorman
 issue again pending, GF filed a motion for reconsideration of Judge Komada's July 9, 1998, order finding 
Moorman
 inapplicable to Kal Kan's negligence claim against GF.  According to GF, if the court granted Allen's motion as to 
Moorman
, "it should likewise grant GF's motion for reconsideration of its motion to dismiss [Kal Kan's] complaint."

On June 22, 2000, Judge Gary Jacobs, the new judge presiding, granted GF's motion to reconsider and considered both Allen's motion to dismi
ss the third-party complaint and GF's motion to dismiss Kal Kan's negligence claim at the same time, since both motions involved a similar application of the 
Moorman
 doctrine.  In a June 24, 2000, docket entry, Judge Jacobs granted both Allen's and GF's motions, finding Kal Kan's negligence claims and GF's third-party negligence claim improperly sought recovery of economic loss under a tort theory, as stated in 
Moorman
.  Further, Judge Jacobs found both causes of action did not fall within the recognized exceptions to the 
Moorman
 doctrine.

On February 22, 2001, Kal Kan filed a motion for entry of final judgment against GF pursuant to Supreme Court Rule 304(a).  155 Ill. 2d R. 304(a).  Judge Jacobs allowed the motion on March 28, 2001, finding no just reason for delaying appeal of the order granting GF's motion to reconsider.  This appeal followed.  Neither Heritage nor Allen is a party to this appeal.

II.  ANALYSIS

The issue before us is a simple one:  did the trial court err in holding that the economic-loss doctrine of 
Moorman
 applied to the case?  However, the facts of the case make the issue one of apparent first impression in Illinois.  The issue is better framed in more general terms:  does the economic-loss doctrine of 
Moorman
 apply to the loss of construction materials where a subcontractor's alleged negligence in construction is alleged to have caused the loss?

As a preliminary matter, we note GF's initial motion to dismiss Kal Kan's complaint was filed pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 1996)).  Thus, our review of the trial court's grant of the motion to dismiss is 
de
 
novo
.  
Neade v. Portes
, 193 Ill. 2d 433, 439, 739 N.E.2d 496, 500 (2000).  When considering such an appeal, we interpret all well-pled allegations and supporting documents in the light most favorable to the nonmoving party.  
In re Chicago Flood Litigation
, 176 Ill. 2d 179, 189, 680 N.E.2d 265, 270 (1997).  Only where the plaintiffs fail to allege facts supporting a cause of action should the court grant the motion to dismiss.  
Chicago Flood Litigation
, 176 Ill. 2d at 189, 680 N.E.2d at 270.

A. The 
Moorman
 Doctrine 

The crux of the dispute between the parties involves the prospective application of a line of Illinois cases that begin with 
Moorman
, 91 Ill. 2d 69, 435 N.E.2d 443.  In 
Moorman
, the plaintiff had purchased from the defendant a bolted-steel grain-storage tank.  The tank later developed a crack in one of its steel plates.  The plaintiff brought an action alleging, as one count, (1) the tank was not reasonably safe due to defects in its design and manufacturing and, in a separate count, (2) the defendant had negligently designed the tank.  The complaint alleged damage only to the tank itself.  Moorman, 91 Ill. 2d at 73-74, 435 N.E.2d at 445.

The supreme court affirmed the trial court's dismissal of both the strict liability and negligence counts, concluding a complaint alleging qualitative defects in a product does not belong in tort.  According to the court, a disappointed consumer cannot assert, based on inferior workmanship that led to eventual deterioration, a recovery under a negligence.  
Moorman
, 91 Ill. 2d at 86, 435 N.E.2d at 450.  Thus, 
Moorman
 was the first case to stand for the broader proposition that purely economic damages cannot be recovered in tort.

According to the court in 
Moorman
, "economic loss" can be defined as "'damages for inadequate value, costs of repair[,] and replacement of the defective product, or consequent loss of profits--without any claim of personal injury or damage to other property.'"  
Moorman
, 91 Ill. 2d at 82, 435 N.E.2d at 449, quoting Note, 
Economic Loss in Products Liability Jurisprudence
, 66 Colum. L. Rev. 917, 918 (1966)
.  Further, economic loss can also be expressed as "'the diminution in the value of the product because it is inferior in quality.'"  
Moorman
, 91 Ill. 2d at 82, 435 N.E.2d at 449, quoting Comment, 
Manufacturers' Liability to Remote Purchasers for 'Economic Loss' Damages--Tort or Contract?
, 114 U. Pa. L. Rev. 539, 541 (1966).

Thus, to recover pure economic loss under a negligence theory, there must be a showing of harm above and beyond disappointed expectations.  
Redarowicz v. Ohlendorf
, 92 Ill. 2d 171, 177, 441 N.E.2d 324, 327 (1982).  A buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects.  
Redarowicz
, 92 Ill. 2d at 177, 441 N.E.2d at 327;
 see W. Prosser, Torts §92, at 613 (4th ed. 1971).  This policy stems from the theory that tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law and the Uniform Commercial Code (810 ILCS 5/1-101 through 1-209 (West 1996)) offer the appropriate remedy for economic losses occasioned by diminished commercial expectations not coupled with injury to person or property.  See 
Chicago Flood Litigation
, 176 Ill. 2d at 200, 680 N.E.2d at 275, quoting 
In re Illinois Bell Switching Station Litigation
, 161 Ill. 2d 233, 241, 641 N.E.2d 440, 444 (1994), quoting 
Moorman
, 91 Ill. 2d at 86, 435 N.E.2d at 450.  Put another way, the economic-loss rule is founded on the theory that parties to a contract may allocate their risks by agreement and do not need the special protections of tort law to recover damages caused by a breach of contract.  
East River Steamship Corp. v. Transamerica Delaval, Inc.
, 476 U.S. 858, 871-874, 90 L. Ed. 2d 865, 877-79, 106 S. Ct. 2295, 2302-04 (1986).

The economic-loss doctrine bars a tort remedy related to a purchaser's disappointed expectations due to deterioration, internal breakdown, or nonaccidental cause.  
Chicago Flood Litigation
, 176 Ill. 2d at 200-201, 680 N.E.2d at 275.  This limitation on tort recovery holds true regardless of the plaintiff's inability to recover under an action in contract.  
Anderson Electric, Inc. v. Ledbetter Erection Corp.
, 115 Ill. 2d 146, 153, 503 N.E.2d 246, 249 (1986).

Only three exceptions to this general rule against contract damages in a tort case have been recognized.  A plaintiff may still recover economic damages in tort when (1) the plaintiff has sustained a personal injury or property damage as a result of a sudden or dangerous occurrence; (2) the plaintiff's damages are proximately caused by the defendant's intentional, false misrepresentation; or (3) the plaintiff's damages are proximately caused by a negligent misrepresentation made by a defendant in the business of supplying information for the guidance of others in their business transactions.  
Chicago Flood Litigation
, 176 Ill. 2d at 199, 680 N.E.2d at 275, citing 
Moorman
, 91 Ill. 2d at 86, 88-89, 435 N.E.2d at 451, 452.

B.  The 
Moorman
 Doctrine Bars Kal Kan's Negligence Action

Kal Kan has sought only economic damages from GF; no personal injury has been alleged.  According to the fourth-amended complaint, Kal Kan suffered "property damage, including but not limited to the [frame] owned by [Kal Kan] and other additional damages in the total amount of $306,000."  The second-amended complaint--the subject of GF's original motion to dismiss--made an identical allegation.  Even if we interpret all such allegations in the light most favorable to Kal Kan, we must assume the damages sought are for pure economic loss, the loss of value of the frame itself, and lost profits due to the delay in construction.  Such a conclusion is further supported by the record of the hearing on GF's initial motion to dismiss before Judge Komada.  Therein, counsel for Kal Kan stated the $306,000 damage amount represented "the loss of use of the [frame] *** [plus] the cost to replace the [frame]."  This was reiterated by counsel for Kal Kan at oral argument.  Hence, there is little doubt the damages sought by Kal Kan are purely economic.

Since the cause of action was brought in negligence, the specter of 
Moorman
 was rightly raised.  The question is then whether any exception to 
Moorman
 applied.  Neither of the latter two exceptions applies to the instant case, as Kal Kan made no allegation regarding any representations of GF or Heritage.  We are thus left to determine whether Judge Jacobs was correct in holding that the loss of the frame was not "property damage, resulting from a sudden or dangerous occurrence."  (Emphasis omitted.)  
Chicago Flood Litigation
, 176 Ill. 2d at 199, 680 N.E.2d at 275.  Our inquiry is necessarily bipartite:  (1) was the thunderstorm a "sudden and dangerous occurrence" and (2) was the destruction of the frame "property damage"?  We need consider only whether Kal Kan has properly alleged both of these elements.

1. 
The
 
Thunderstorm
 
Was
 
a
 "
Sudden
 
and
 
Dangerous
" 
Occurrence

First, Kal Kan suggests the thunderstorm that contributed to the collapse of the frame was a "sudden and dangerous" occurrence within the meaning of the first 
Moorman
 exception.  Kal Kan offers little support for this proposition; the complaint merely states the frame collapsed in a thunderstorm.  Likewise, we have been unable to determine the definitive role the "sudden and dangerous" requirement plays in a 
Moorman
 analysis.  In fact, in 
Moorman
, the court did not even specifically state whether the property damage to the tanks was caused by a "sudden and dangerous occurrence."  Instead, the court capitalized on the "sudden and dangerous" language to make a further policy statement regarding the separation of contract law and tort law.  According to the court in 
Moorman
, the crack in the tank:

"was not the type of sudden and dangerous occurrence best served by the policy of tort law that the manufacturer should bear the risk of hazardous products.  *** Plaintiff suffered a commercial loss of the type that the law of warranty is designed to protect.  Consequently, repair and reinforcement of the tank and loss of the tank's use constitute economic losses for which plaintiff cannot recover under a theory of strict liability in tort."  
Moorman
, 91 Ill. 2d at 85-86, 435 N.E.2d at 450.

The best definition we have found is from a federal case, which held the "sudden and highly dangerous occurrence" exception applies in situations when the sudden occurrence is "
highly
 
dangerous
 
and
 
presents
 
the
 
likelihood
 
of
 
personal
 
injury
 
or injury
 
to
 
other
 
property
."  (Emphasis added.)  
Stepan Co. v. Winter Panel Corp.
, 948 F. Supp. 802, 807-08 (N.D. Ill. 1996).  While this definition may be circular in its logic, it provides some guidance in explanation of the role of the "sudden and dangerous" occurrence in a 
Moorman
 analysis.

Moreover, this definition expresses well the logic implicit in several Illinois cases interpreting 
Moorman
 that found the complained-of occurrence to be less than "sudden and dangerous."  See, 
e.g.
, 
Wheeling Trust & Savings Bank v. Tremco Inc.
, 153 Ill. App. 3d 136, 142-43, 505 N.E.2d 1045, 1049-50 (1987) (holding claimed defects in windows, streaking and etching, did not cause "sudden and calamitous" damage).

Working from this definition, we find Kal Kan has sufficiently alleged the claimed property damage was caused by a sudden and dangerous event.  Certainly, the thunderstorm was a sudden event, consistent with a tortious act.  Further, the character of the storm, combined with the collapse of the frame, almost certainly presented the likelihood of personal injury or injury to other property.  Under the facts as alleged, and the law as we have defined, the collapse of the frame during the thunderstorm was a sufficiently "sudden and dangerous occurrence" to fall within the scope of the first 
Moorman
 exception.

2. 
The
 
Frame
 
Was
 
Not
 "
Other
 
Property
" 
for
 
Moorman
 
Purposes

However, the issue of whether the thunderstorm was a "sudden and dangerous occurrence" is not determinative under a 
Moorman
 analysis.  As our supreme court has held, "the event, by itself, does not constitute an exception to the economic[-]loss rule.  Rather, the exception is composed of a sudden, dangerous, or calamitous event 
coupled
 with personal injury or property damage."  (Emphasis added.)  
Chicago Flood Litigation
, 176 Ill. 2d at 200, 680 N.E.2d at 275.  Stated simply, "[f]or damages to be recoverable in tort, the sudden, dangerous, or calamitous occurrence must still result in personal injury or property damage.  Absent injury to a plaintiff's person or property, a claim presents an economic loss not recoverable in tort."  
Chicago Flood Litigation
, 176 Ill. 2d at 201, 680 N.E.2d at 275-76.

We note the courts have added an important gloss to the meaning of "property damage" for purposes of 
Moorman
.  Mere damage to 
any
 property is not sufficient; the property must be "other property," extrinsic from the product itself.  The root of this exegesis is a line from 
Moorman
 we have cited above: "'[e]conomic loss' has been defined as 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits--without any claim of personal injury or damage to 
other
 
property
."  (Emphasis added.)  
Moorman
 91 Ill. 2d at 82, 435 N.E.2d at 449, quoting 66 Colum. L. Rev. at 918; see also 
Trans States Airlines v. Pratt & Whitney Canada, Inc.
, 177 Ill. 2d 21, 27, 682 N.E.2d 45, 48 (1997.  The 
Moorman
 court further explained, "'[w]hen the defect causes an accident "involving some violence or collision with 
external
 
objects
," the resulting loss is treated as property damage.'"  
Moorman
, 91 Ill. 2d at 83, 435 N.E.2d at 449, quoting 
66 Colum. L. Rev. at 918.

Simply put, a product that damages only itself cannot be the subject of a suit for damages.  See 
Moorman
, 91 Ill. 2d at 85, 435 N.E.2d at 450 ("where only the defective product is damaged, economic losses caused by qualitative defects falling under the ambit of a purchaser's disappointed expectations cannot be recovered under a strict liability theory").  It is with this proposition in mind that we determine whether the frame was other property for purposes of 
Moorman
.  Kal Kan contends that, by virtue of its ownership of the frame, the frame itself constitutes "other property" within the meaning of 
Moorman
.  We disagree.

First, the only reference to any transfer of interest in the frame is a letter, dated May 15, 1995, from a representative of Heritage to Kal Kan, which reads as follows:

"I have invoiced [
sic
] you for the pre-engineered structural steel for the 60,000 SF [
sic
] warehouse project, on invoice #13913.  The steel is fabricated and is your property.  The materials are being stored at Kirby Building Systems at Kirby Drive, Portland, Tennessee, 37148."

This letter does not conclusively establish Kal Kan's ownership of the frame, and we need not consider it.  The letter was not attached to any of Kal Kan's complaints, but rather as an exhibit to Kal Kan's memoranda in opposition to various motions to dismiss.

Since the motion to dismiss that forms the basis of the instant appeal was filed pursuant to section 2-615 of the Code of Civil Procedure, we are constrained to consider only those facts alleged in the complaint (see 
Chicago Flood Litigation
, 176 Ill. 2d at 189, 680 N.E.2d at 270); and here the facts relating to Kal Kan's ownership of the frame are contradictory.  For example, the only allegation regarding Kal Kan's ownership of the frame is a paragraph which states:

"As a direct and proximate result of the negligent acts and omissions of GF, [Kal Kan] sustained property damage, including[,] but not limited to[,] damage to the structural steel framework owned by [Kal Kan]***."

However, the fourth-amended complaint also incorporates by reference the purchase order between Kal Kan and Heritage, which stated Heritage was to "provide materials, labor, equipment, engineering, and supervision to construct a warehouse."  Further, the addendum provided that Heritage must "furnish all of the materials and perform all the labor necessary" to construct the warehouse.  

In ruling on a section 2-615 motion, "[e]xhibits attached to the complaint are included as part of the complaint and must also be considered."  
Gardner v. Senior Living Systems, Inc.
, 314 Ill. App. 3d 114, 117, 731 N.E.2d 350, 353 (2000).  Where an inconsistency between the factual allegation and the exhibit arises, the exhibit controls over the factual allegations in the pleading.  
F.H. Prince & Co. v. Towers Financial Corp.
, 275 Ill. App. 3d 792, 797, 656 N.E.2d 142, 146 (1995).  Given the contradictory facts in support of Kal Kan's conclusory assertion it was the owner of the property destroyed in the collapse, namely, the frame, the trial court properly could have concluded the frame did not qualify as "other property" for purposes of a 
Moorman
 analysis. 

Even if we accept, 
arguendo
, Kal Kan's argument that it was the owner of the frame, 
Moorman
 and its progeny suggest the frame was not "other property" for purposes of an economic-loss analysis.  Kal Kan has suggested GF's product was merely the assembly of the frame itself, such that the frame existed as "other property," independent of GF's assembly of it.

We find such an argument unavailing.  In similar cases, the critical fact of the inquiry has been whether the damaged property was part of an integrated system
(comment: 1), such that the damaged property could not be separated from the "product."  See, 
e.g.
,
 
East River
, 476 U.S. at 867-68, 90 L. Ed. 2d at 874-75, 106 S. Ct. at 2300.  

In 
East River
, the plaintiff contracted with the defendant to design, manufacture, and supervise the installation of turbines for use in oil tankers.  
East River
, 476 U.S. at 859, 90 L. Ed. 2d at 869-70, 106 S. Ct. at 2296.  When the turbines later malfunctioned, the plaintiffs brought suit claiming strict liability for design defects in the turbines and for negligent supervision of their installation.  
East River
, 476 U.S. at 861, 90 L. Ed. 2d at 871, 106 S. Ct. at 2297.  In affirming the dismissal, the Court found there was no damage to "other property."  Determinative for the Court was the allegation by the plaintiff that each turbine had only damaged itself.  
East River
, 476 U.S. at 867, 90 L. Ed. 2d at 874, 106 S. Ct. at 2300.  Further, reasoned the Court, "[s]ince each turbine was supplied by [defendant] as an integrated package[,] *** each is properly regarded as a single unit."  
East River
, 476 U.S. at 867, 90 L. Ed. 2d at 874, 106 S. Ct. at 2300.

A similar approach was followed by our own supreme court in 
Trans States
.  There, an aircraft manufacturer bought an airplane engine from the defendant and incorporated it into one of its airframes.  
Trans States
, 177 Ill. 2d at 23, 682 N.E.2d at 46.  While the aircraft was in use, the engine failed and caught fire, damaging not only itself but the surrounding airframe.  The plaintiff, a lessor of the completed aircraft, filed suit for the costs of repair of the engine and airframe, as well as lost revenues and other damages.  
Trans States
, 177 Ill. 2d at 24, 682 N.E.2d at 47.  The plaintiff argued, much as Kal Kan has, that the engine and airframe constituted two separate products, such that damage to the airframe was damage to "other property."  
Trans States
, 177 Ill. 2d at 42, 682 N.E.2d at 55.

Disagreeing, the supreme court found the engine and airframe comprised a single product because, under the terms of the lease agreement, the plaintiff had bargained for a fully integrated aircraft, rather than having bargained separately for an engine and an airframe.  
Trans States
, 177 Ill. 2d at 50-51, 682 N.E.2d at 58.  Critical to the court's determination was the "object of the contract or bargain that governs the rights of the parties."  
Trans States
, 177 Ill. 2d at 50, 682 N.E.2d at 58.  Thus, the proper consideration in our case turns on the injured party's bargained-for expectation.

Here, Kal Kan clearly bargained for the completed warehouse.  Its primary contract was with Heritage to "provide materials, labor, equipment, engineering, and supervision to construct a warehouse."  Kal Kan acknowledges it had no separate bargain with GF.  With that in mind, what good would GF's service or "product" have been without the "other property"?  Standing alone, the frame had no intrinsic value to Kal Kan, unless it desired to erect the frame itself.  Just as the component parts of the airplane became an integrated product in 
Trans States
 and 
East River
, so too was the frame to become an integrated warehouse.

We are further persuaded such an analysis brings our decision in line with the policy of 
Moorman
.  In addressing the bargained-for expectations of the parties in 
Trans States
, our supreme court stated:

"[T]he economic[-]loss doctrine should bar tort recovery when a defective product causes the type of damage one would reasonably expect as a direct consequence of the failure of the defective product.  Given the foreseeable consequences that a defective engine would result in damage to the airframe, we believe that parties to the sublease agreement could have bargained in consideration of such risks." 
 
Trans States
, 177 Ill. 2d at 51, 682 N.E.2d at 58.

Here, the primary dispute between Kal Kan and GF centers around who is responsible for the replacement cost of the frame.  Allocating risk, especially the risk of loss, is traditionally within the purview of contract law, commonly the law of insurance and indemnification.
  Moreover, the right to recover damages for a delay in construction is entirely consistent with contract remedies.  
Ambrose v. Biggs
, 156 Ill. App. 3d 515, 519, 509 N.E.2d 614, 616-17 (1987) 

If indeed the primary purpose of the economic-loss doctrine is based on the principle that parties to a contract may allocate their risks by agreement and do not need the special protections of tort law to recover damages caused by a breach of contract (
East River
, 476 U.S. at 871-74, 90 L. Ed. 2d at 877-79, 106 S. Ct. at 2302-04), then we must, on policy grounds affirm the trial court's judgment.  Kal Kan contracted, through Heritage, for the erection of the steel-frame system.  When it collapsed, no interest other than business expectancy was damaged.  The "product" of GF only damaged itself.  This is a matter squarely within the realm of the parties' bargain.  

Had the complaint alleged the frame fell and damaged the existing warehouse, or vehicles belonging to Kal Kan, our analysis might be different.  We are most persuaded in this regard by 
Redarowicz
, 92 Ill. 2d at 178, 441 N.E.2d at 327, wherein our supreme court indicated a homeowner could sue a builder in tort if an adjoining wall collapsed and damaged the homeowner's furniture due to the builder's negligence.  However, noted the court: 

     "'A duty to use ordinary care and skill is not imposed in the abstract.  It results from a conclusion that an interest entitled to protection will be damaged if such care is not exercised.  Traditionally, interests which have been deemed entitled to protection in negligence have been related to safety or freedom from physical harm.  Thus, where personal injury is threatened, a duty in negligence has been readily found.  Property interests also have generally been found to merit protection from physical harm.  However, where mere deterioration or loss of bargain is claimed, the concern is with a failure to meet some standard of quality.  This standard of quality must be defined by reference to that which the parties have agreed upon.'"  (Emphasis omitted.)  
Redarowicz
, 92 Ill. 2d at 177-78, 441 N.E.2d at 327, quoting 
Crowder v. Vandendeale
, 564 S.W.2d 879, 882 (Mo. 1978).

In its broadest sense, Kal Kan's claim fits squarely within the policy of 
Moorman
.  
Moorman
 stands for the proposition that tort law should not unnecessarily infringe on relationships that are traditionally contractual.  By asking us to allow a negligence action for a failure to receive the benefit of its bargain, Kal Kan has invited us to extend the boundaries of tort law past their natural boundaries.  To agree would be to permit contract law to "drown in a sea of tort."  
East River
, 476 U.S. at 866, 90 L. Ed. 2d at 874, 106 S. Ct. at 2300, citing G. Gilmore, The Death of Contract 87-94 (1974).  We decline the invitation.

III.  CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

STEIGMANN, J., concurs.

MYERSCOUGH, J., specially concurs in part and dissents in part.

JUSTICE MYERSCOUGH, specially concurring in part and dissenting in part:

I respectfully concur in part and dissent in part.  I concur that the thunderstorm alleged was a sudden and dangerous occurrence.  I dissent in part on the 
Moorman
 issue of "other property."  In this case, the warehouse was not alleged to be defective nor was the steel frame.  And, GF's service--erecting and bracing the steel frame for the warehouse--was separate and apart from the steel-frame system and the warehouse itself.  Therefore, damage to the steel frame as a result of GF's negligence in erecting and bracing is damage to "other property," and the economic-loss doctrine does not bar Kal Kan's claims.  For these reasons, I concur in part and dissent in part and would reverse the trial court.

COMMENTS AND ANNOTATIONS
Comment 1:
Not exactly.  The critical factor for the Illinois Supreme Court is remedy-determinative: whether the remedy is