NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230623-U

NO. 4-23-0623

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 12, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| FPM, LLC, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Boone County |
| OLLMANN ASSOCIATES ARCHITECTS, P.C., d/b/a | ) | No. 22LA2 |
| Ollmann Ernest Martin Architects & Engineers; | ) | |
| SCANDROLI CONSTRUCTION CO.; CERONI | ) | |
| PIPING COMPANY; TWIN CITY FAN COMPANIES, | ) | |
| LTD., d/b/a Aerovent; and JC CROSS CO., | ) | |
| Defendants, | ) | Honorable |
| (Scandroli Construction Co. and Twin City Fan | ) | Stephen E. Balogh, |
| Companies, Ltd., d/b/a Aerovent, Defendants-Appellees). | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Steigmann and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court reversed in part the trial court's order dismissing plaintiff's second amended complaint, holding plaintiff sufficiently pled causes of action for (1) breach of contract, (2) breach of express warranty, (3) negligence under an exception to the economic loss doctrine for sudden and dangerous events causing damages to other property, and (4) intentional and fraudulent misrepresentation.

¶ 2    In September 2022, plaintiff, FPM, LLC (FPM), the operator of an industrial heat treating business, filed a second amended complaint against defendants, Ollmann Associates Architects, P.C., d/b/a Ollmann Ernest Martin Architects & Engineers (OEM), Scandroli Construction Co. (Scandroli), Ceroni Piping Company (Ceroni), Twin City Fan Companies, LTD., d/b/a Aerovent (Aerovent), and JC Cross Co. (JC Cross), seeking damages based on the failure of ventilators installed on the roof of its facility that resulted in a fire. In its complaint, FPM alleged causes of action based on breach of contract, breach of express and implied

warranties, indemnification, intentional misrepresentation, negligence, violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/2 (West 2020)), and promissory estoppel.

¶ 3    Aside from OEM, all defendants moved to dismiss under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2022)) for failure to state a claim. The trial court granted the motions, dismissed the complaint with prejudice, and denied FPM's motion for leave to file a third amended complaint. FPM appealed, and we dismissed the appeal against Ceroni and JC Cross for lack of jurisdiction but denied the subsequent motions to dismiss for lack of jurisdiction brought by Scandroli and Aerovent.

¶ 4    On appeal, FPM contends the trial court erred by determining it failed to sufficiently plead (1) Scandroli, as the general contractor, breached its express contractual duties to perform the work in accordance with the contract documents, which required the procurement and installation of a ventilation system and fans that could withstand extreme heat, including temperatures up to 600 degrees Fahrenheit at the roofline; (2) Scandroli breached an express warranty the materials used would conform to the requirements of the contract documents and be free from defects; (3) Aerovent intentionally and fraudulently misrepresented the capabilities of its roof ventilators in a product catalog and e-mail to OEM; and (4) negligence claims against Scandroli and Aerovent based on the application of exceptions to the economic loss doctrine, also known as the *Moorman* doctrine (see *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 435 N.E.2d 443 (1982)). FPM also contends the court erred in denying its motion for leave to file a third amended complaint.

¶ 5    We determine FPM sufficiently pled causes of action on all counts it raises on appeal. Accordingly, we affirm in part, reverse in part, and remand the cause for further

proceedings. Because we reverse in part and remand, we do not decide whether the trial court erred in denying FPM's motion for leave to file a third amended complaint.

¶ 6                                    I. BACKGROUND

¶ 7          On September 16, 2022, FPM filed its second amended complaint, which is the subject of this appeal. The second amended complaint raised 22 counts. OEM filed an answer to counts XXI and XXII, and the remaining defendants filed motions to dismiss. The complaint and its attachments included the following facts.

¶ 8          FPM operates an independent commercial heat-treating facility. Generally, heat treatment is the use of controlled heating and cooling operations to bring about a desired change in the physical properties of a metal. FPM's customers employ FPM's heat-treating services to improve the structural and physical properties for some particular use or for future work of the metal. FPM's heat treatment services typically involve heating the metal to extreme temperatures to achieve the desired result, such as hardening or softening of the material.

¶ 9          In 2018, FPM began a project to renovate one of its facilities located in Cherry Valley, Illinois (the plant), to house its critical heat-treating operations (the project). FPM's heat-treating work at the plant required the use of a variety of furnaces operating at internal temperatures ranging from 400 to 2000 degrees Fahrenheit and from 100 to 600 degrees Fahrenheit of external exhaust at the roof line. Thus, the plant required a specialized heat-and-smoke-removal ventilation system capable of withstanding those temperatures. Such specialized equipment was "part and parcel" to FPM's operations and a vital component to safety at the plant, because the failure or inadequate performance of such ventilation equipment threatened a significant risk of catastrophic property damage and a threat to human life or severe bodily harm. In particular, the failure or inadequate performance of the ventilation system could easily lead to

fires and/or air-quality issues. A previous fire at the plant caused by a failure in the ventilation system precipitated the need for FPM to perform the renovations at the plant. FPM alleged "[a]t all relevant times, OEM, Scandroli, Ceroni, Aerovent, and JC Cross knew FPM's Plant required a specialized heat and smoke removal ventilation system that could withstand and operate under the aforementioned extreme heat conditions."

¶ 10        In December 2018, FPM entered into a contract with OEM (OEM Contract), generally engaging OEM to serve as architect for the project. FPM contracted with Scandroli to serve as the general contractor for the project (Scandroli Contract).

¶ 11        Under the OEM Contract, OEM's scope of work included preparing design drawings and construction specifications setting forth the quality levels of materials, systems, and other requirements for construction of the plant. OEM's designs and specifications for the plant required a specialized ventilation system and fans that could withstand extreme heat temperatures, ranging from 400 to 2000 degrees Fahrenheit internally, and from 100 to 600 degrees Fahrenheit of external exhaust at the roof line, which FPM alleged was "informed by its review and approval of submittals from Scandroli."

¶ 12        Regarding the Scandroli Contract, FPM alleged it relied on Scandroli's specialized knowledge in selecting and procuring proper labor and materials for the plant. Scandroli signed its contract with FPM on April 12, 2019. That contract, labeled as a standard form agreement from the American Institute of Architects, provided the "Contract Documents" and included drawings and specifications issued prior to execution of the agreement. It further stated, "prior to the execution of this agreement, the Contractor has provided design and constructability consultation on the Project," which the contract referred to as the "Prior Work," and which was incorporated into the agreement and would comply with the standard of care.

The contract stated the owner and Scandroli would work proactively with the other as necessary to facilitate expedited development of the design and construction of the project. In the portion of the contract pertaining to contract fees, a provision stated "the Contractor shall be paid a $34,000 Preconstruction Services Fee for its participation in the design phase of the Project and its completion of the Prior Work."

¶ 13　　　　　Under the Scandroli Contract, Scandroli was required to "execute the Work described in the Contract Documents." The contract defined the term "Work" as follows:

> "[T]he construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment, and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project."

¶ 14　　　　　The contract further provided:

> "The Contractor shall supervise and direct the Work, using The Contractor's best skill and attention. The Contractor shall be solely responsible for, and have control over, construction means, methods, techniques, sequences, and procedures, and for coordinating all portions of the Work under the Contract. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences, or procedures, the Contractor shall evaluate the jobsite safety thereof and shall be solely responsible for the jobsite safety of such means, methods, techniques, sequences, or procedures."

¶ 15　　　　　Regarding materials, the contract provided:

"Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work. The Contractor shall be responsible for safe storage and protection against theft and damage of all materials until they have been properly incorporated in the Work and of all tools and equipment owned by the Contractor or any Subcontractor until removed from the Project site at completion of the Work."

Scandroli agreed to provide all services "with the degree of skill, care and diligence usually exercised by and expected of nationally recognized contractors experienced in projects similar to the Project in scope, size, complexity and nature."

¶ 16    The Scandroli Contract authorized Scandroli to subcontract portions of the work it did not typically perform. When it did so, Scandroli was required to obtain bids for the portions of the work to be subcontracted, and "deliver such bids to [OEM] and [FPM] with a recommendation as to which bids should be accepted." The contract also provided Scandroli "shall not be relieved of its obligations to perform the Work in accordance with the Contract Documents either by the activities or duties of [OEM] in [OEM's] administration of the Contract, or by tests, inspections or approvals required or performed by persons or entities other than [Scandroli]." Additionally, Scandroli agreed to "be responsible to [FPM] for acts and omissions of [Scandroli's] employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for, or on behalf of, [Scandroli] or any of its

Subcontractors." Thus, FPM alleged "by nature of acting as general contractor for the Project, Scandroli had ultimate responsibility for the performance of the Work regardless of the actions of any other, including OEM, FPM, any subcontractors of Scandroli, or any sub-subcontractors of Scandroli."

¶ 17    The contract contained the following express warranty provision:

"The Contractor warrants to [FPM] and [OEM] that materials and equipment furnished under the Contract will be of good quality and new unless the Contract Documents require or permit otherwise. The Contractor further warrants that the Work will conform to the requirements of the Contract Documents and will be free from defects, except for those inherent in the quality of the Work the Contract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, alterations to the Work not executed by The Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage."

In addition, Scandroli agreed that all special warranties required by the contract documents would be issued in the name of FPM or be transferrable to FPM. The contract also contained an indemnification provision.

¶ 18    In July 2019, Scandroli subcontracted with Ceroni to provide material and labor for the installation of the ventilation system to evacuate heat from the plant. FPM alleged Scandroli failed to obtain an executed warranty by Ceroni in favor of FPM, even though the contract with Scandroli contained a template for such a warranty.

¶ 19　　　　　FPM alleged, as part of their respective scopes of work and purported expertise, Scandroli and Ceroni were responsible for procuring and installing a ventilation system with fans that could meet FPM's stated needs and withstand the extremely high-heat environment of the plant. Scandroli procured, through Ceroni, a series of ventilation fans manufactured by Aerovent, and FPM paid Scandroli a sum that included Ceroni's procurement and installation of the ventilators. FPM alleged Aerovent and its agent, JC Cross, represented the ventilation fans were capable of effectively operating in the high-heat environment of the plant. In particular, FPM alleged Aerovent and JC Cross made express representations regarding the capabilities of the ventilators in Aerovent's product specification catalog and in a June 2019 e-mail from JC Cross to OEM. FPM alleged "[s]uch representations included that the Aerovent fans were designed, tested, and capable of withstanding extreme temperatures of 600 [degrees Fahrenheit]."

¶ 20　　　　　FPM included Aerovent's product specification catalog as an exhibit to the complaint. That catalog stated the following concerning the roof ventilator at issue in this case:

> "The Model SV40 combines year-round powered ventilation with smoke and heat removal capabilities. This ventilator is designed to be used as a standard roof exhaust fan and a high temperature smoke and heat removal fan. It is a three-part assembly consisting of:
>
> 1. Stack cap damper assembly with fusible link kit
>
> 2. Curb base
>
> 3. High temperature, belt driven tubeaxial fan with a welded steel propeller[.]"

The catalog also stated:

"The Model SV40 high temperature roof ventilator is designed

specifically to comply with Industrial Risk Insurers' (IRI) recommendations for

smoke and heat ventilation and is UL Certified for Smoke Control Systems.

Unit testing was conducted at Aerovent's certified test lab using a 4

million BTU gas fired burner capable of generating airstream temperatures in

excess of 1000 [degrees Fahrenheit]. Airstream temperatures were precisely

monitored using potentiometers with chromel-alumel thermocouples.

Temperatures were monitored at several vital areas within the ventilator

assembly: inlet side of the fan wheel, fan bearings, bearing housing, belt tube, and

the motor compartment.

Based on this extensive testing, the Model SV40 is capable of

withstanding continuous operation at 600 [degrees Fahrenheit], extended

operating periods at 800 [degree Fahrenheit] and 8 hours or more with an

airstream temperature of 1000 [degrees Fahrenheit]."

Another page of the catalog stated, "SV40 Smoke and Heat Roof Ventilators shall be designed to

withstand continuous operation with internal airstream temperatures of 600 [degrees Fahrenheit]

and a minimum of 8 hours with internal airstream temperatures of 1000 [degrees Fahrenheit]." It

further stated. "Ventilators shall be tested and certified in accordance with industry accepted test

codes and guaranteed by the manufacturer to deliver at the rated published performance levels.

In addition, each unit shall be factory run tested prior to shipment." The catalog also stated:

"High temperature construction features shall include a heat slinger cast of A240

high temperature aluminum alloy. This radial bladed heat sink fan wheel shall

draw cooling air from the exterior of the fan housing through the drive tube and

over the bearings, absorbing and dissipating shaft heat. A heat shield shall be provided to protect the motor from radiated heat.

Sheaves shall be cast iron with two heat-resistant static conducting belts. Bearings and belts are enclosed in an air insulated housing for protection."

¶ 21 Exhibit No. 5 which was attached to the complaint, included diagrams of two different sizes of SV40 ventilators. The exhibit included Scandroli's logo with a box stating "reviewed" checked underneath. The exhibit also had a stamp from OEM with a box checked that read "reviewed without comment." The diagrams showed the motor and bearings housed in a box protruding from a cylinder which contained the fan assembly. Drawings of the ventilators included an arrow pointing up that stated "airflow" outside of the drawing of the ventilator as a whole. One could infer from the drawing that the "airflow" is the movement of air through the cylinder and not the box that protrudes from the side. However, other inferences could be the "airflow" encompasses the entire assembly or is only the flow of air outside of the assembly. A definition of "airstream" or "airflow" was not provided. One page of the exhibit included a table labeled "Performance 'A' " and included a difficult to read box with "70 [degrees Fahrenheit]" written inside. A second page had the same table for a different size of the ventilator but had "600 [degrees Fahrenheit]" written inside.

¶ 22 FPM alleged, "Upon information and belief, Aerovent knew at all relevant times prior to the sale of its fans for use at the Plant that the aforementioned representations in its product specification catalog were false and misleading." FPM also alleged Scandroli and Ceroni selected the fans based on the representations made by Aerovent. Based on the product literature, Ceroni submitted Aerovent's fans for approval to Scandroli, who approved them and

sent them to OEM for approval. OEM then approved the submittal, allowing Scandroli to purchase the fans for installation at the plant.

¶ 23      In a June 13, 2019, e-mail between a representative of OEM and a representative of JC Cross, the OEM representative wrote, "I'm looking at the fan submittals and under performance two of them have 70 [degrees Fahrenheit] as the temperature, and the other has 600 [degrees Fahrenheit] as the temperature. That's just the air temperature the fan performance was selected at, not the fans actual temperature rating correct?" The JC Cross representative replied, "That is correct. The fans are all designed for 600 degrees. That's what we were confirming yesterday." FPM alleged "Upon information and belief, Aerovent and JC Cross knew at all relevant times prior to the sale of the Aerovent fans for use at the Plant that the above statement of [JC Cross's representative] was false and misleading." FPM further alleged Aerovent made the alleged misrepresentations for the purpose of inducing approval of the fans by FPM and its contractors, and FPM relied on those misrepresentations when approving and purchasing the fans.

¶ 24      After the fans were installed, and shortly after resuming heat-treating operations at the plant, the Aerovent fans began to fail. FPM alleged, as of the time of the filing, 25 of the 26 Aerovent fans installed on FPM's roof had failed. After the first three or four failures, FPM requested the construction team, including Aerovent, to investigate the failures and determine the root cause of the failures. An investigation done by Aerovent generally determined the fans were failing due to their inability to continuously operate under the high-heat conditions of the plant. As part of the investigation, Aerovent released two reports to FPM regarding the fan failures, which FPM included as exhibits attached to the complaint.

¶ 25        In a report dated December 19, 2019, Aerovent noted "Heat treat process operates 24 hrs/day / 7 days/wk / 365 days/yr."  Aerovent also noted "Only (1) of the fans in each production row has direct line-of-sight to process flame (radiant heat), and it appears that the radiant heat has not raised the bearing temperature beyond the design limit of 475 [degrees Fahrenheit]."  The report stated "Failed motors have melted plastic components (cooling fan and fan cover).  Aerovent is arranging to send at least one of the failed motors for 3rd party inspection to confirm that no other mode of failure occurred."  It also noted "VFD labeled 'B7 HF CHARGE END EX FAN' appeared to have been set for 29.36Hz.  If this is considered normal operation, it will reduce the speed of the fan and the cooling effect on the fan bearings and motor casing."  For the "Root Cause" of the failures, Aerovent wrote:

> "Aerovent S/N 636613-1-3 failed from bearing failure after exposure to an internal bearing temperature greater than 500 [degrees Fahrenheit].  This temperature is known to exceed the design limits of the fan.  The bearings may or may not have survived if the fusible link on the outlet damper had functioned properly (it did not break at 165 [degrees Fahrenheit] as designed).  Fusible links are suitable only for emergency smoke exhaust applications, not for continuous high temperature.  The fusible link was added to each fan due to a BOM linking error, which has been corrected by Aerovent as of 12/16/2019."

Aerovent added:

> "The root cause of the other (4) failed units is not yet officially determined. Aerovent and Ceroni are working to have at least one of the failed motors inspected by a 3rd party.  We observe that the motors were exposed to temperatures beyond their design limit, but whether the heat originated from the

- 12 -

process or from internal electrical sources is unclear. Aerovent will follow up with an addendum to this report as soon as we receive inspection results ***."

¶ 26 In a report dated December 27, 2019, Aerovent noted, "Two (2) of the failed motors were inspected by a 3rd party Electrical Apparatus Service Association (EASA) accredited shop and found to have shorted windings. Further analysis is required to find root cause of the winding shortage, and Aerovent is working with WEG to determine." The record does not specify the meaning of the acronym "WEG." Aerovent also wrote:

"The root cause of the other (4) failed units were due to motor failures. The root cause of motor failure was found to be a short in the internal electrical windings. What caused the short is difficult to prove, but likely cause appears to be the thermal breakdown of the plastic cooling fan cover due to radiant heat emitted from the fan housing."

Aerovent made various recommendations, including replacing the motors with models featuring steel cooling fan covers, because "[t]he steel material can withstand the radiant heat and allow the cooling fan to continue to pass ambient air over the motor components." Aerovent also suggested FPM consider spot checking the air temperature emitted from the belt tube of any fan that had a motor operating below 60Hz for air balance purposes. Aerovent wrote, if the air temperature was higher than 245 degrees Fahrenheit, FPM should consider increasing the motor operating frequency as "this increases the cooling effect on the bearings." Aerovent also wrote, "If the belt tube air temperature rises above 300 [degrees Fahrenheit] for longer than an hour, it may begin to affect the motor integrity." Aerovent also recommended a preventative maintenance schedule.

¶ 27        FPM alleged the reports established Aerovent and JC Cross initially misrepresented the capabilities of the Aerovent fans.  FPM alleged Aerovent's position that 300 degrees Fahrenheit exceeded the maximum operation temperature for the belts was "at war with its earlier representations and promises that the fans were designed to, and in fact could, withstand continuous operation at internal and external temperature far exceeding 300 [degrees Fahrenheit]."  FPM also noted Aerovent's statement the "design limit" for the fan bearings was 475 degrees Fahrenheit and alleged failures of the bearings had been observed on multiple occasions in multiple locations at temperatures significantly less than that amount. FPM included a photograph of a failed fan bearing.  FPM alleged it requested "the testing and backup" for Aerovent's asserted "design limit" for the bearings, but Aerovent responded it did not have that data.

¶ 28        FPM also noted Aerovent admitted one of its fans failed because the temperatures inside the fan exceeded 500 degrees Fahrenheit, which exceeded the design limits of the fan. FPM alleged that admission showed "Aerovent's fans were never designed to operate with internal temperatures exceeding 500 [degrees Fahrenheit]."  Thus, FPM argued the admission plainly established Aerovent's prior representations the fans were designed to withstand continuous temperatures of at least 600 degrees Fahrenheit were knowingly false.

¶ 29        FPM further stated it had "reason to believe that Aerovent's representations regarding its testing of the subject fans were false and misleading given its inability to provide documentation as requested." FPM alleged, after the fans began to fail, FPM asked Aerovent to produce evidence of the " 'extensive testing' " it purportedly conducted to ensure the fans were " 'capable of withstanding continuous operation at 600 [degrees Fahrenheit], extended operating periods at 800 [degrees Fahrenheit] and 8 hours or more with an airstream temperature of 1000

[degrees Fahrenheit],' as represented in its product specification catalog." In response, Aerovent informed FPM that it could not locate any supporting documentation. FPM alleged, "Aerovent's response leads FPM to believe that Aerovent never conducted any such testing and, therefore, that the statement in Aerovent's product specification catalog regarding its 'extensive testing' of the fans was at all times blatantly false." Thus, FPM further alleged Aerovent, and its agent JC Cross, knew before selling the Aerovent ventilators for use at the plant the fans were not capable of performing under extreme heat conditions, as represented and required.

¶ 30　　　　On January 7, 2021, Aerovent fans failed, causing a sudden and dangerous fire to break out at the plant. FPM alleged the fire caused damage to "other property," including burning and/or charring to the interior surface of the belt rooms at the plant. The fire also caused damage to roof curbs and wood nailers, and it forced FPM to shut down operations, causing damage to FPM property other than the fans themselves of over $250,000. The failure of the fans also led to air quality issues at the plant. In order to protect its employees, and under Occupational Safety and Health Administration requirements, FPM was forced to take emergency measures, including shutting down equipment and ventilating the area with surface fans and structure openings to remediate the air quality issues. FPM alleged, had it "not taken emergent protective measures in response to the various aforementioned fan failures, there would have been extreme risk of catastrophic, life-threatening personal injury, and entire loss of property at the Plant."

¶ 31　　　　Based on its factual allegations against Scandroli, FPM alleged breach of contract, breach of express warranty, breach of implied warranty, indemnification, and negligence. Against Aerovent, FPM alleged negligence, negligent misrepresentation, intentional

misrepresentation/fraud, promissory estoppel, and a violation of the Consumer Fraud Act. It also alleged similar causes of action against the other defendants.

¶ 32        OEM filed an answer, and the remaining defendants filed motions to dismiss under section 2-615 of the Code for failure to state a claim (see 735 ILCS 5/2-615 (West 2022)). In support of its motion to dismiss counts I through V, Scandroli argued FPM failed to state a claim for breach of contract because the contract did not require Scandroli to choose the ventilation fans. Instead, as the general contractor, Scandroli was required to install the fans selected by OEM, and FPM did not allege they were installed incorrectly. Scandroli further argued it did not fail to obtain a warranty from Ceroni because its contract with Ceroni contained a standard warranty, and neither Ceroni nor Scandroli could be held responsible for misrepresentation or concealment of facts by another party or for materials they had no control over selecting. Likewise, Scandroli argued it could not provide an express warranty for material specifications it had no control in designing or selecting.

¶ 33        Regarding the existence of an implied warranty, Scandroli noted it was not the seller of the goods, and FPM did not rely on its skill or judgment to select the goods, because it expected Scandroli to subcontract for work it did not normally perform. Scandroli further argued FPM did not allege negligent installation, and thus, Scandroli had no duty to indemnify FPM. Finally, Scandroli argued FPM could not state a claim for negligence because, under the economic loss doctrine as stated in *Moorman*, FPM could not assert tort claims to cover economic losses. Scandroli argued an exception to the doctrine for sudden and calamitous events causing damage to other property was not applicable because the fans deteriorated over time instead of in a sudden event.

¶ 34        In a memorandum in support of its motion to dismiss counts XI through XV,

Aerovent also argued FPM failed to state claims for negligence under the economic loss

doctrine. Aerovent argued the promissory estoppel claim failed for the same reason because it

was also a repackaged negligence claim and, in the alternative, no promise had been alleged. As

to fraudulent misrepresentation and the Consumer Fraud Act, Aerovent argued FPM failed to

state its claim with sufficient particularity or specificity. Aerovent also provided a diagram from

the exhibits attached to the complaint with added hand-drawn markings and an argument the fact

that individual components of the ventilators could not withstand 600 degrees Fahrenheit did not

show the ventilator as a whole could not operate at 600 degrees Fahrenheit.

¶ 35        At the hearing on the motions, the trial court expressed concern FPM was

attempting to hold Scandroli, acting as the general contractor, liable for knowing the fans would

not operate under temperatures reaching 600 degrees, stating OEM approved the fans, and

Scandroli was simply given the equipment and told to install it. In a written order, the court

granted the motions to dismiss. The court generally found the economic loss doctrine barred the

negligence claims against all parties and no exception applied. As to Scandroli, the court found,

reading the contract as a whole, while Scandroli was to ensure materials and equipment were of

good quality and in conformance with the contract documents, it did not agree to undertake

anything more than supervisory authority. The court found there was no allegation Scandroli

should have known anything about the design of the ventilators or that the contract documents

allowed Scandroli to deviate from specifications for them. In particular, addressing FPM's

argument the ventilators were not in conformance with contract specifications, the court wrote,

"What FPM does not allege, however, is that Scandroli either had or agreed to have any

involvement in the details—the design and manufacture—of the equipment." The court also

found there was no allegation the ventilators were not installed in conformance with the contract documents. Regarding warranties, the court next found Scandroli was not the seller of the ventilators and did not promise the ventilators would conform to the contract documents, and there was no evidence that it even knew what the specific description of the assembled ventilators entailed. The court also found FPM had no contractual right of indemnification.

¶ 36    As to Aerovent, the trial court found FPM's claim of misrepresentation failed because Aerovent's recommendation of its product was a mere opinion and not actionable as fraud. Citing *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 388-89, 618 N.E.2d 459, 464 (1993), the court further stated FPM failed to plead anything factual to show Aerovent did anything "other than express the capabilities of its products based on application of mathematical formulae and physical properties" of the plant "and the known characteristics of its own industrial ventilators." The court then noted the product catalog referred to the ability of the ventilation system to operate continuously with "internal airstream temperatures" of 600 degrees Fahrenheit. The court wrote:

> "The brochure also explains that the internal components of the system, including the motor, are isolated from the airstream, protected by a heatshield and cooled by a 'radial bladed heat sink fan wheel' which draws cooling air from the exterior of the fan housing through the drive tube and over those components."

Referring to exhibit No. 5, the court stated, "Review of the drawings reveals the isolated—out of the airstream—components of the system where the problems are believed to have occurred." The court also noted the investigation reports referred to failed internal components and heat above the designed operating temperatures within the internal component housing. The court stated the reports did not make reference to the failure of any component within the airstream of

the system and did not identify a cause of the failures but did make recommendations regarding improved shielding and preventive maintenance.

¶ 37        The trial court then wrote:

"The alleged misrepresentation was that Aerovent represented that the systems could operate continuously with an internal airstream temperature of 600 [degrees Fahrenheit]. There is a difference, as evidenced in the drawings and specifications, between the internal airstream of the ventilator and the internal components of the ventilator which are outside of the airstream, protected by cooling a fan, a cross draft of outside air and a heatshield.

Taking the pleadings as a whole and including the exhibits, FPM has pled, very specifically, that Aerovent represented that its system would operate with an internal airstream (the air within the duct) of up to 1000 [degrees Fahrenheit] for up to eight hours. There is nothing affirmatively pled or in the exhibits that tends to show that this specific representation is untrue. To the contrary, the brochure and specifications in Aerovent's proposal, both of which are part of the pleadings, are very specific and clearly separate the operating characteristics of the system's internal airstream from those shielded and cooled internal components of the vent. In context, '[u]nder the allegations of the complaint, the representations concerned a machine of known physical characteristics and its capabilities based upon the application of certain mathematical formulae and laws of physics to those physical properties.' *Peters*, 248 Ill. App. 3d at 388-89."

The court further found FPM failed to sufficiently plead knowledge, holding FPM's allegation Aerovent knew or should have known the representations were false at the time they were made,

- 19 -

without factual support, was an "unsupported conclusion." The court next rejected FPM's promissory estoppel and Consumer Fraud Act claims.

¶ 38   On April 20, 2023, FPM filed motions for reconsideration and for leave to file a third amended complaint, with the proposed third amended complaint attached as an exhibit. That complaint sought to add new claims under the Uniform Commercial Code (810 ILCS 5/1-101 *et seq.* (West 2020)). FPM also sought to clarify Scandroli was paid for its warranty and supervision of subcontractors' work, and had recommended and approved the Aerovent ventilators. FPM also added allegations Scandroli breached its warranty by improperly installing the ventilators.

¶ 39   JC Cross and Ceroni moved for a finding under Illinois Supreme Court Rule 304(a) (eff. March 8, 2016) that there was no just reason to delay enforcement or appeal of the order dismissing the complaint against them. On April 24, 2023, the trial court granted that motion and made such a finding.

¶ 40   On June 15, 2023, the trial court denied the motion to reconsider, stating at the end of its order, "The court has noted twice that FPM's remedies, if any, are found in contract under the Uniform Commercial Code." The court, in the same order, without analysis, denied the motion for leave to file a third amended complaint "without prejudice." The court added, under Rule 304(a), there was no just cause for delay of enforcement or appeal.

¶ 41   On June 28, 2023, FPM moved for clarification regarding the denial of the motion for leave to amend and jurisdiction. On June 30, 2023, the parties met for a hearing and discussed concerns about the interplay of filing amended pleadings against all defendants while also seeking to appeal. The trial court stated, had it granted the motion to reconsider, it would have allowed the amended pleading. The court entered an amended order stating the motion for

- 20 -

leave to file an amended complaint was denied, removing the "without prejudice" language, and listing the order as final as to JC Cross, Ceroni, Scandroli, and Aerovent.

¶ 42   This appeal followed. We granted motions to dismiss for lack of jurisdiction made by Ceroni and JC Cross. As such, the trial court's dismissal of counts VI through X and XVI through XX are no longer at issue in this appeal. However, we denied motions to dismiss made by Scandroli and Aerovent. Accordingly, we address only FPM's arguments concerning Scandroli and Aerovent on appeal.

¶ 43                                    II. ANALYSIS

¶ 44   On appeal, FPM contends the trial court erred by granting defendants' motions to dismiss under section 2-615 the Code and determining FPM failed to sufficiently plead (1) Scandroli, as the general contractor, breached its express contractual duties to perform the work in accordance with the contract documents, which required the procurement and installation of a ventilation system and fans that could withstand extreme heat, including temperatures up to 600 degrees Fahrenheit at the roofline; (2) Scandroli breached an express warranty the materials used would conform to the requirements of the contract documents and be free from defects; (3) Aerovent intentionally and fraudulently misrepresented the capabilities of its roof ventilators in a product catalog and an e-mail to OEM; and (4) negligence claims against Scandroli and Aerovent based on application of the economic loss doctrine. FPM also contends the court erred in denying its motion for leave to file a third amended complaint. On appeal, FPM does not challenge the dismissal of the claims asserting breach of implied warranty (count III), indemnification (count IV), promissory estoppel (count XIV), and a violation of the Consumer Fraud Act (count XV). Accordingly, we do not address the court's dismissal of those claims.

¶ 45        A motion to dismiss under section 2-615 of the Code challenges only the legal sufficiency of the complaint. *Schloss v. Jumper*, 2014 IL App (4th) 121086, ¶ 20, 11 N.E.3d 57. In ruling on a section 2-615 motion to dismiss, "the question is 'whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted.' " *Green v. Rogers*, 234 Ill. 2d 478, 491, 917 N.E.2d 450, 458-59 (2009) (quoting *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81, 806 N.E.2d 632, 634 (2004)). The trial court should not grant a motion to dismiss "unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief." *Tedrick v. Community Resource Center, Inc.*, 235 Ill. 2d 155, 161, 920 N.E.2d 220, 223 (2009).

¶ 46        When ruling on a section 2-615 motion, "[t]he only matters to be considered *** are the allegations of the pleadings themselves." *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 485, 639 N.E.2d 1282, 1289 (1994); see *Cwikla v. Sheir*, 345 Ill. App. 3d 23, 29, 801 N.E.2d 1103, 1109 (2003) ("In ruling on a section 2-615 motion, the court may not consider affidavits, products of discovery, documentary evidence not incorporated into the pleadings as exhibits, or other evidentiary materials."). A document that is attached to a complaint as an exhibit is "considered to be part of the pleading, and facts stated in the exhibit are considered as having been alleged in the complaint." *Tucker v. Soy Capital Bank & Trust Co.*, 2012 IL App (1st) 103303, ¶ 22, 974 N.E.2d 820. "[M]atters contained in such exhibits which conflict with allegations of the complaint negate any contrary allegations of the complaint." (Internal quotation marks omitted.) *Tucker*, 2012 IL App (1st) 103303, ¶ 23. We review a dismissal under section 2-615 *de novo*. *Beacham v. Walker*, 231 Ill. 2d 51, 57, 896 N.E.2d 327, 331 (2008).

¶ 47        A. Breach of Contract Claims Against Scandroli (Count I)

¶ 48     FPM first contends the trial court erred in dismissing its breach of contract claims against Scandroli. FPM argues it sufficiently pled the contract documents made Scandroli responsible for "the Work" and "the Prior Work," which included Scandroli's expertise in the selection, installation, and warranty related to the ventilation equipment for the facility. FPM further notes it alleged reliance on Scandroli's expertise and contracted to pay Scandroli for participation in the design phase of the project as part of the prior work. FPM argues Scandroli was at least partly responsible for recommending and procuring a ventilation system that could meet the needs of the plant, and Scandroli approved the submittal of the fans from Ceroni and submitted those fans to OEM, who then approved the submittal based on Scandroli's advice. Scandroli, however, argues it did not design the project and was not given project specifications. Instead, Scandroli argues, under the definition of "the Work" in the contract, all it was required to do was adhere to the design specifications as identified by OEM and build according to the designs and specifications it was given.

¶ 49     The elements to state a cause of action for breach of contract are (1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages. *Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 175, 682 N.E.2d 118, 121 (1997). At issue here is whether FPM sufficiently pled there was a breach, which is dependent on whether it sufficiently pled Scandroli agreed to procure fans sufficient to meet the needs of the plant.

¶ 50     The determination of the intent of the parties to a contract may either be a question of law or fact. *Terracom Development Group, Inc. v. Coleman Cable & Wire Co.*, 50 Ill. App. 3d 739, 743, 365 N.E.2d 1028, 1031 (1977). If the language in a contract is ambiguous, then the determination of its meaning is a question of fact and not to be resolved by a section 2-

615 motion to dismiss. *Monroe Dearborn Ltd. Partnership v. Board of Education of City of Chicago*, 271 Ill. App. 3d 457, 462, 648 N.E.2d 1055, 1058 (1995). If, however, the language in the contract is unambiguous, then the construction of the alleged contract is a question of law. *Monroe Dearborn*, 271 Ill. App. 3d at 462, 648 N.E.2d at 1058. In addition, the Illinois Supreme Court has stated:

> "The primary object in construing a contract is to give effect to the intentions of the parties involved. Their intent must be determined solely from the language used when no ambiguity in its terms exists, and a strict construction of that language which reaches a different result from that intended by the parties should not be adopted." *Schek v. Chicago Transit Authority*, 42 Ill. 2d 362, 364, 247 N.E.2d 886, 888 (1969).

¶ 51　　Here, the trial court found, while Scandroli was to ensure the materials and equipment were of good quality and in conformance with the contract documents, it did not agree to any involvement in the design and manufacture of equipment for the project. The court further found there was no allegation Scandroli should have known anything about the design of the ventilators or that the contract documents allowed Scandroli to deviate from the specifications for the ventilators. The court also found there was nothing pled or in the exhibits suggesting Scandroli had or undertook anything more than general supervisory authority. However, those findings ignored portions of the contract stating explicitly otherwise.

¶ 52　　Contrary to the trial court's finding, FPM did specifically allege Scandroli was directly involved with the design and specifications of the project. Per the contract, the "contract documents" included drawings and specifications issued prior to execution of the agreement. It further stated, "prior to the execution of this agreement, [Scandroli] has provided design and

constructability consultation on the Project," which the contract referred to as the "Prior Work." In addition, the contract provided a substantial payment for preconstruction participation in the design phase of the project and the prior work. In its complaint, FPM alleged it relied on Scandroli's expertise and specifically alleged Scandroli and Ceroni were responsible for procuring a specialized heat and smoke removal ventilation system that could meet FPM's stated needs. Scandroli approved the submittal of the ventilators from Ceroni and submitted those to OEM, who approved the submittal. The court made no mention of these provisions, which contradict the court's determination and provide allegations Scandroli was contracted to use its expertise to recommend and provide ventilators sufficient to meet the needs of the project. Thus, while the court was correct that Scandroli did not design the Aerovent ventilation system, it failed to recognize that FPM alleged Scandroli was instrumental in selecting and recommending the system as part of its contractual obligations.

¶ 53 Nevertheless, in the trial court, and in its brief on appeal, Scandroli asserted it did not "come up with the design" and was not given the specifications for the design. It also asserts the contract stated Scandroli was to adhere to the design specifications in the contract documents, as identified by the architects and engineers at OEM. Scandroli does not provide a citation to the location in the contract for those assertions other than pointing to its own argument to the court at the hearing on the motion to dismiss. We have found no such provisions in the contract. In any event, even if the contract contained such provisions, Scandroli's argument ignores FPM's allegations that Scandroli did indeed take part in the design of the project and was paid for its "Prior Work" in doing so. At best, Scandroli's arguments raise issues of fact as to the intent of the parties concerning the contract, which are not appropriately decided in a section 2-615 motion to dismiss.

¶ 54 Had the contract not contained provisions concerning "Prior Work," and had there been no allegations or evidence Scandroli contracted to provide design consultation for the project and recommend equipment based on its expertise, the trial court's determination would arguably have been well founded. But here, where FPM alleged Scandroli was involved in the design and tasked with recommending and procuring proper equipment to meet that design based on its specific expertise, and that equipment later turned out not to function to specifications, with an inference that was perhaps through a misunderstanding of the abilities of equipment, FPM alleged sufficient facts to plead a cause of action for breach of the contract. To be sure, the full extent of Scandroli's participation in the design of the project and choice of the ventilators is not fully known, as it is unknown whether the equipment itself was faulty, the choice in procuring it was poorly made by Scandroli or another party, or if user error on the part of FPM led to the failures. But at this juncture, we must take the facts pled by FPM as true. When we do so, it is not clearly apparent that no set of facts can be proved that would entitle plaintiff to relief. Accordingly, the court's dismissal of the breach of contract claim at this juncture was in error.

¶ 55 B. Express Warranty Claims Against Scandroli (Count II)

¶ 56 FPM next argues the trial court erred in dismissing its express warranty claim against Scandroli. The court denied the warranty claim, stating an express warranty is made by a seller to a buyer based on a contractual promise the goods shall conform to their description. The court found FPM did not allege Scandrioli promised anything about whether the ventilators would conform to their description or even knew what the specific description of the ventilators entailed.

¶ 57 As previously discussed, FPM alleged Scandroli took part in the design of the project and recommended and procured the ventilators. Scandroli's approval appears on an

exhibit showing the design and specifications of the ventilators. Meanwhile, Scandroli was not warranting the ventilators as a seller, but instead as a contractor guaranteeing his work. In that regard, FPM needed only to allege Scandroli failed to comply with the guarantees set forth in the contract, as it has been held a contractor is responsible for the work guaranteed, whether the defect is due to the contractor's work or that of a third person. *Intaglio Service Corp. v. J. L. Williams & Co.*, 95 Ill. App. 3d 708, 712, 20 N.E.2d 634, 637 (1981). In particular, the First District, in *Intaglio*, stated:

> "No reason is perceived why contractors may not guarantee against all defects, whatever their origin, whether they arise from insufficiency of the materials supplied, from unskillfulness of workmen, or from unfitness of the plan or design, whether devised by the one or the other of the parties to the contract, or by some other person. In case of a contract with such warranty, it will be presumed that the consideration for the guaranty was included in the price agreed to be paid for the work to be done. It is not unreasonable to suppose that one desiring a fabric or structure, or an apparatus, or a piece of mechanism to be made, the idea of which is his own or that of his servant or agent, may wish to take the judgment as to its practicability, usefulness and durability, of some person or persons who have a practical knowledge and experience in the construction of things of that sort, and in such case the requirement of a guaranty would be an effectual way of getting the benefit of such judgment. It is the province of the courts to enforce the contract which the [parties] have made, not to make a contract for them. It must be presumed, that had it been their intention to limit the guaranty to the workmanship of the contractors and their servants, and to the materials furnished,

such intention would have been expressed in the contract." (Internal quotation marks omitted.) *Intaglio*, 95 Ill. App. 3d at 712-13, 20 N.E.2d at 638.

¶ 58 Here, Scandroli warranted the "Work," which under the Scandroli Contract included all labor, materials, and equipment. FPM alleged Scandroli took part in recommending and procuring the ventilators, and the Scandroli Contract included a warranty the "Work," materials, and equipment would conform to the requirements of the contract documents and be free from defects. The contract further provided equipment not conforming to those requirements may be considered defective. FPM alleged the ventilators did not conform to the contract documents, which included the provision of ventilators capable of operating at temperatures of 600 degrees Fahrenheit. Thus, FPM sufficiently pled facts to support a claim for breach of warranty based on the alleged failure of the ventilators, which it asserted was encompassed by the terms "Work," materials, or equipment under the contract.

¶ 59 C. Intentional Misrepresentation Claim Against Aerovent (Count XIII)

¶ 60 FPM next argues the trial court erred in determining it failed to sufficiently plead Aerovent knowingly made false statements of material fact. Citing primarily *Spiegel v. Sharp Electronics Corp.*, 125 Ill. App. 3d 897, 466 N.E.2d 1040 (1984), and *Peters*, the court noted mere recommendations of a product or opinion were not representations of fact actionable as fraud. The court found FPM failed to plead anything factual tending to show Aerovent did anything other than express the capabilities of its products based on application of mathematical formulae and known characteristics of the ventilators, and FPM failed to plead Aerovent knew or should have known those representations were false at the time they were made. Analyzing exhibits attached to the complaint, the court further found Aerovent represented the ventilation systems operate continuously with an internal airstream temperature of 600 degrees Fahrenheit,

but the drawings and specifications showed a difference between the internal airstream and the internal components of the ventilator that were outside of the airstream. Based on that, the court determined the exhibits did not show Aerovent's representations were untrue.

¶ 61                                 1. *Expressions of Opinion Versus Statements of Fact*

¶ 62             "The elements of a cause of action for fraudulent misrepresentation are '(1) a false statement of a material fact; (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.' " *Peters*, 248 Ill. App. at 387, 618 N.E.2d at 463 (1993) (quoting *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286, 402 N.E.2d 599, 601 (1980)). The facts constituting fraud must be pled with specificity and particularity, including what representations were made, when they were made, who made the representations, and to whom they were made. *Peters*, 248 Ill. App. 3d at 387, 618 N.E.2d at 463.

¶ 63             "To support an action for fraud, the alleged misrepresentation must be one of fact and not an expression of opinion." *Peters*, 248 Ill. App. 3d at 387, 618 N.E.2d at 463. "Statements regarding future events are considered opinions, not statements of fact." *Peters*, 248 Ill. App. 3d at 387, 618 N.E.2d at 463. " '[T]he general rule denies recovery for fraud based upon a false representation of intention or future conduct.' " *Peters*, 248 Ill. App. 3d at 387, 618 N.E.2d at 463 (quoting *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 334, 371 N.E.2d 634, 641 (1977)). "Even a false promise of future conduct with no current intent to fulfil that promise will not constitute fraud." *Peters*, 248 Ill. App. 3d at 387, 618 N.E.2d at 463. "In determining whether a statement is one of fact or of opinion, we look to all the circumstances of the particular case." *Peters*, 248 Ill. App. 3d at 388, 618 N.E.2d at 463-64.

¶ 64 In *Peters*, the First District held representations by defendant contractors that a cooling system could perform to certain specifications were statements of fact, not statements regarding future events or opinions. There, the defendants supplied thermal banks for a heating, ventilation, and air conditioning (HVAC) system. After the HVAC system failed to meet performance specifications, plaintiffs sued defendants for fraudulent misrepresentation, alleging defendants had misrepresented their equipment could meet the performance specifications. *Peters*, 248 Ill. App. 3d at 388, 618 N.E.2d at 464. The allegedly fraudulent statements were the thermal banks were " 'as called for in the specifications,' " and had a capacity of "100,000 pounds of ice at 2 1/2 [inch] thickness in 12 hours under certain conditions." *Peters*, 248 Ill. App. 3d at 388, 618 N.E.2d at 464.

¶ 65 The *Peters* defendants argued the statements were not actionable as fraud because the statements related to future events. The appellate court disagreed. It stated, although the alleged representations related to the performance of the thermal banks upon their installation as part of the HVAC system, the representations should be treated as ones of present fact rather than future performance. *Peters*, 248 Ill. App. 3d at 388-89, 618 N.E.2d at 464-65. The court found, according to the allegations of the complaint, the representations "concerned a machine of known physical characteristics and its capabilities based upon the application of certain mathematical formulae and laws of physics to those physical properties." *Peters*, 248 Ill. App. 3d at 388-89, 618 N.E.2d at 464. The court further stated the representations concerned "the capabilities of a machine which was either in existence at the time the statements were made, or one of a known, specified, and certain type." *Peters*, 248 Ill. App. 3d at 389, 618 N.E.2d at 464. As such, the statements must be considered representations of existing fact, and thus actionable as fraud. *Peters*, 248 Ill. App. 3d at 388-89, 618 N.E.2d at 464-65.

¶ 66        In reaching its determination, the court relied on similar cases from other jurisdictions illustrating the difference between factual representations supporting an action for fraud and mere opinion or "sales talk" involving future promises concerning a product. See *Peters*, 248 Ill. App. 3d at 389, 618 N.E.2d at 464 (" 'Representations by an expert on power to one not having equal knowledge as to the amount of energy which standard makes of motors and engines will develop are not future promises, but are statements with reference to known facts based on tests and mathematical computations. Such representations differ materially from "sellers' talk" or mere opinion expressed to one having equal knowledge or equal opportunities for knowledge.' " (quoting *Maxwell Ice Co. v. Brackett, Shaw & Lunt Co.*, 116 A. 34, 36, 80 N.H. 236 (1921))); see also *Bareham & McFarland, Inc. v. Kane*, 228 A.D. 396, 398, 240 N.Y.S. 123, 127 (1930) (representations that a heater, when installed in a home, would heat the building to 70 degrees in zero-degree weather, that fuel would cost no more than $350 per season, and that gas for the pilot light would not exceed $1 per month held to "relate to the inherent capacity, character and quality of the heater, and what it was actually capable of doing," and thus constitute "positive statements of existing facts" rather than mere " 'dealer's talk' "); *Traylor Engineering & Manufacturing Co. v. National Container Corp.*, 70 A.2d 9, 13-14, 45 Del. 143, 152-54 (1949) (representations that a kiln would consume less than 65 gallons of oil per ton of lime produced and that the kiln would easily produce 70 tons of high-quality lime per day held to be actionable as fraud).

¶ 67        The court in *Peters* further noted the representations at issue were not dependent upon any future conduct of the defendants. *Peters*, 248 Ill. App. 3d at 389, 618 N.E.2d at 465. The court distinguished the circumstances from *Spiegel*, in which representations that a copier would produce " 'picture perfect copies,' " were held to be " 'mere commendation or opinion.' "

*Peters*, 248 Ill. App. 3d at 388, 618 N.E.2d at 464 (quoting *Spiegel*, 125 Il. App. 3d at 902, 466 N.E.2d at 1044). The court also distinguished *LaScola v. US Sprint Communications*, 946 F.2d 559, 568 (7th Cir. 1991), a case in which a company represented it has a " 'lucrative compensation plan,' that executives were 'straight shooters' and the company is 'ethical.' " *Peters*, 248 Ill. App. 3d at 389, 618 N.E.2d at 465. There, the statements were "too general and difficult to substantiate to be considered statements of fact." *Peters*, 248 Ill. App. 3d at 389, 618 N.E.2d at 465. The *Peters* court noted, in both *Spiegel* and *LaScola*, the representations were subjective, difficult to prove, and could be considered " 'dealer talk; " or " 'puffing.' " *Peters*, 248 Ill. App. 3d at 389-90, 618 N.E.2d at 465. In contrast, in the case before it, the representations were specific and of an objective, quantifiable, and verifiable nature. *Peters*, 248 Ill. App. 3d at 390, 618 N.E.2d at 465. Thus, the defendants made misrepresentations of material fact by stating that their thermal banks could meet the performance specifications. *Peters*, 248 Ill. App. 3d at 389-90, 618 N.E.2d at 465.

¶ 68 Here, the trial court misapplied *Peters* to hold representations about a machine of known physical characteristics and its capabilities based upon the application of certain mathematical formulae and laws of physics to those physical properties were statements of opinion that required dismissal. *Peters* held the opposite. Under *Peters*, such statements were considered representations of existing fact, as opposed to representations of opinions dependent on future action, sales talk, or puffery, and thus were actionable as fraud. As in *Peters*, the statements made by Aerovent were specific and based on allegedly extensive and specific testing. Aerovent stated in its product catalog that, based on the testing, the ventilators were "capable of withstanding continuous operation at 600 [degrees Fahrenheit], extended operating periods at 800 [degree Fahrenheit] and 8 hours or more with an airstream temperature of 1000

[degrees Fahrenheit]." Another page of the catalog also stated, "SV40 Smoke and Heat Roof Ventilators shall be designed to withstand continuous operation with internal airstream temperatures of 600 [degrees Fahrenheit] and a minimum of 8 hours with internal airstream temperatures of 1000 [degrees Fahrenheit]." These are specific representations of an objective, quantifiable, and verifiable nature and, as such, were representations of existing fact, as opposed to mere statements of opinion concerning future action, sales talk, or puffery.

¶ 69                                    2. *Reliance*

¶ 70          Aerovent also argues *Peters* requires this court to affirm the trial court's dismissal because, in *Peters*, the appellate court ultimately affirmed the trial court's dismissal based on the plaintiff's failure to adequately plead reliance on the misrepresentations. *Peters*, 248 Ill. App. 3d at 391, 618 N.E.2d at 465-66. In *Peters*, the appellate court noted the plaintiff alleged reliance in a conclusory fashion, without presenting facts indicating it was ever shown a letter, proposal, or brochure in which the alleged misrepresentations were made. Such is not the case here, where FPM attached the product catalog to the complaint and specifically alleged its contractors recommended the Aerovent fans based on the product literature. Thus, we conclude FPM also sufficiently alleged reliance.

¶ 71                                    3. *Knowledge*

¶ 72          The trial court also found FPM failed to sufficiently plead knowledge, holding FPM's allegation Aerovent knew or should have known the representations were false at the time they were made, without factual support, was an "unsupported conclusion."

¶ 73          "Illinois is a fact-pleading state, which means that, although pleadings are to be liberally construed and formal or technical allegations are not necessary, a complaint must, nevertheless, contain facts to state a cause of action." *Blevins v. Marcheschi*, 2018 IL App (2d)

170340, ¶ 29, 101 N.E.3d 807. "A complaint is deficient when it fails to allege facts necessary for the plaintiff to recover." *Blevins*, 2018 IL App (2d) 170340, ¶ 29. "But a pleader is not required to set out his evidence. Only the ultimate facts to be proved should be alleged and not the evidentiary facts tending to prove such ultimate facts." *Blevins*, 2018 IL App (2d) 170340, ¶ 29. " 'A statement of a defendant's knowledge is an allegation of ultimate fact and not a conclusion.' " *Blevins*, 2018 IL App (2d) 170340, ¶ 29 (quoting *Ward v. Community Unit School District No. 220*, 243 Ill. App. 3d 968, 974, 614 N.E.2d 102, 106 (1993)). "The plaintiff need not plead the evidentiary facts that he will use to prove the defendant's knowledge." *Blevins*, 2018 IL App (2d) 170340, ¶ 29.

¶ 74        Here, FPM alleged Aerovent knew its statements about the capabilities of the ventilators were false. This satisfies the pleading requirement that plaintiffs need allege only ultimate facts, not evidentiary facts. See *Blevins*, 2018 IL App (2d) 170340, ¶ 30 (holding defendants in a case involving fraudulent misrepresentation of water damage sufficiently alleged knowledge by alleging the defendants knew of water infiltration and damage in or about a damaged wallboard).

¶ 75        Further, even if we were to require more, FPM made additional allegations inferring knowledge when it alleged Aerovent could not produce evidence of the testing of its ventilators as set forth in both its brochure and reports and alleged Aerovent made various admissions. FPM specifically alleged it requested "the testing and backup" for Aerovent's asserted "design" limit of 475 degrees Fahrenheit for the bearings, but Aerovent responded that it did not have that data. FPM also asked Aerovent to produce evidence of the " 'extensive testing' " it purportedly conducted to ensure the fans were " 'capable of withstanding continuous operation at 600 [degrees Fahrenheit], extended operating periods at 800 [degrees Fahrenheit]

and 8 hours or more with an airstream temperature of 1000 [degrees Fahrenheit],' as represented in its product specification catalog." In response, Aerovent informed FPM that it could not locate any supporting documentation.

¶ 76        FPM further noted Aerovent admitted one of its fans failed because the temperatures inside the fan exceeded 500 degrees Fahrenheit, which exceeded the design limits of the fan. FPM alleged that admission showed "Aerovent's fans were never designed to operate with internal temperatures exceeding 500 [degrees Fahrenheit]." Thus, FPM argued the admission plainly established Aerovent's prior representations the fans were designed to withstand continuous temperatures of at least 600 degrees Fahrenheit were knowingly false. Thus, FPM sufficiently pled knowledge in order to bring its claim for fraudulent misrepresentation against Aerovent.

¶ 77                    4. *The Trial Court's Consideration of Exhibits*

¶ 78        The trial court also found the exhibits contradicted or disproved FPM's allegations of fraud based on differences between the components within the internal airstream of the ventilator and the components outside of the airstream. Essentially, the trial court drew a distinction between representations Aerovent made about components arguably within the airstream, such as the fans, and those arguably outside the airstream, such as the motors, ultimately finding Aerovent's representations were applicable only to components within the airstream, which the court determined were inside of the cylinder containing the fan. The court specifically found "the drawings" revealed the problem occurred in the components outside of the airstream, such as with the motors. FPM argues the court's determination based on the exhibits was inappropriate fact finding and in error.

¶ 79          We note the exhibits do not define the term "airstream" or clearly delineate its location or its effect on components within or outside the airstream. One could infer from the location of an arrow labeled as "airflow" shown outside the depiction of the ventilator in exhibit No. 5 that the "airflow" is the movement of air through the cylinder containing the fan and not the box that protrudes from the side containing the motor and other components. However, another inference could be the "airflow" encompasses the entire assembly, either inside or outside of it. Thus, the exhibit does not definitively support the trial court's finding.

¶ 80          Further, even if the "airstream" encompassed only the portion of the ventilator inside the cylinder depicted in the exhibit, Aerovent made representations arguably covering components both within and outside such an "airstream" when its product specification catalog stated the ventilator model was "capable of withstanding continuous operation at 600 [degrees Fahrenheit], extended operating periods at 800 [degrees Fahrenheit] and 8 hours or more with an airstream temperature of 1000 [degrees Fahrenheit]." Given the use of a comma after "600 [degrees Fahrenheit]" and lack of comma thereafter, that statement arguably separated representations about the "airstream temperature" from the broader representation of the ventilator's ability to sustain "continuous operation at 600 [degrees Fahrenheit]." However, elsewhere, the catalog stated the ventilators "shall be designed to withstand continuous operation with internal airstream temperatures of 600 [degrees Fahrenheit] and a minimum of 8 hours with internal airstream temperatures of 1000 [degrees Fahrenheit]." Meanwhile, when referring to airstream testing in excess of 1000 degrees Fahrenheit, Aerovent's product specification catalog also stated, "Temperatures were monitored at several vital areas within the ventilator assembly: inlet side of the fan wheel, fan bearings, bearing housing, belt tube, and the motor compartment." Thus, nothing clearly or definitively showed components of the ventilators aside from the fans,

such as the motors, were not considered part of the representations made by Aerovent concerning the ability of the ventilators as a whole, or the fans as an individual component, to perform continuously at 600 degrees Fahrenheit both within and outside the "airstream." Instead, the product specification catalog is ambiguous on the matter. Moreover, reports from Aerovent broadly indicated the fans were not capable of operating at the temperatures stated in the product specification catalog. In addition, Aerovent's own reports did not definitively determine the cause of all of the failures. Further, FPM presented an e-mail communication from a representative of Aerovent to a representative of OEM broadly stating the fans were capable of performing at 600 degrees Fahrenheit, without reference to the "airstream."

¶ 81    In general, it appears the trial court may have relied on Aerovent's argument related to its motion to dismiss where Aerovent added its own hand-drawn markings to the depiction of the ventilator from exhibit No. 5 and provided its argument and interpretation of the exhibit based on those added markings. Aerovent has also provided the same in its brief on appeal. However, those additional markings and interpretation were not part of FPM's pleadings and were not facts to be considered at that stage of the proceedings. Thus, we disagree the exhibits contradict the allegations in the complaint such that the issue may be determined as a matter of law. Whether the Aerovent's representations were actually false is ultimately an issue of evidentiary fact to be determined at later stages in the proceedings. Based on the allegations before us, it is not apparent any set of facts cannot be proved that would entitle FPM to relief. Accordingly, we hold the court erred in dismissing the intentional and fraudulent misrepresentation claim against Aerovent.

¶ 82    D. Negligence and the Economic Loss Doctrine (Counts V, XI, and XII)

¶ 83    FPM next contends the trial court erred when it determined the general negligence claims against both Scandroli and Aerovent and the negligent misrepresentation claim against Aerovent were barred by the economic loss doctrine. FPM contends it sufficiently pled exceptions to the doctrine for sudden and dangerous events causing damage to other property or for fraud or misrepresentation.

¶ 84    "The *Moorman* doctrine, also known as the economic loss doctrine, states that there can be no recovery in tort for purely economic losses." *Flores v. Aon Corp.*, 2023 IL App (1st) 230140, ¶ 56 (citing *Moorman*, 91 Ill. 2d at 88, 435 N.E.2d at 451-52). "Economic loss is defined as 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property.' " (Internal quotation marks omitted.) *Flores*, 2023 IL App (1st) 230140, ¶ 56 (quoting *Moorman*, 91 Ill. 2d at 82, 435 N.E.2d at 449). "The [economic loss] doctrine is founded on the theory that 'parties to a contract may allocate their risks by agreement and do not need the special protections of tort law to recover damages caused by a breach of contract.' " *Flores*, 2023 IL App (1st) 230140, ¶ 56 (quoting *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 327 Ill. App. 3d 346, 351, 763 N.E.2d 428, 434 (2002)). In particular, the court in *Moorman* held, "Tort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence," while the "remedy for economic loss, loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause, on the other hand, lies in contract." *Moorman*, 91 Ill. 2d at 86, 435 N.E.2d at 450. Thus, the economic loss doctrine denies a tort remedy for those whose complaint is rooted in the disappointment of commercial or contractual expectations. *Sienna Court Condominium Ass'n v. Champion Aluminum Corp.*, 2018 IL 122022, ¶ 21, 129 N.E.3d 1112.

¶ 85            There are three exceptions to the economic loss doctrine: (1) where the plaintiff sustained damage, such as personal injury or property damage, resulting from a sudden, dangerous, or calamitous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false misrepresentation; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions. *1324 W. Pratt Condo. Ass'n v. Platt Construction Group, Inc.*, 404 Ill. App. 3d 611, 618, 936 N.E.2d 1093, 1100 (2010); *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 199, 680 N.E.2d 265, 275 (1997). FPM does not argue the third exception applies.

¶ 86            First, as previously discussed, the trial court erred in dismissing FPM's intentional, fraudulent misrepresentation claim against Aerovent. Thus, the court also erred in determining FPM failed to plead such an exception was applicable to the economic loss doctrine in regard to Aerovent. As to FPM's remaining negligence claims against Scandroli, and to the extent it may later be determined Aerovent did not misrepresent the capabilities of the ventilators, FPM argues the fire resulting from the defective fans resulted from a sudden and dangerous event that caused damage to property other than the ventilators themselves.

¶ 87            "In order to apply the 'sudden or dangerous occurrence' exception and recover economic damages in negligence, (1) the economic damages must result from 'a sudden, dangerous, or calamitous event,' and (2) the event must also cause 'personal injury or property damage.' " *1324 W. Pratt Condo. Ass'n*, 404 Ill. App. 3d at 618, 936 N.E.2d at 1100 (quoting *Chicago Flood Litigation*, 176 Ill. 2d at 200-01, 680 N.E.2d at 275).

¶ 88                            1. *Sudden and Dangerous or Calamitous Event*

¶ 89            "Damages which are the proximate result of a sudden and calamitous occurrence that causes harm to other property are compensable in tort." *American Xyrofin, Inc. v. Allis-Chalmers Corp.*, 230 Ill. App. 3d 662, 671, 595 N.E.2d 650, 657 (1992). Courts have defined a sudden or dangerous occurrence as "a sudden event, consistent with a tortious act," that is " 'highly dangerous and presents the likelihood of personal injury or injury to other property.' " (Emphasis omitted.) *Mars*, 327 Ill. App. 3d at 353, 763 N.E.2d at 435-36.

¶ 90            "The type of harm attendant to a sudden and calamitous event does not flow from disappointed commercial expectations; rather, it arises from '[h]azards peripheral to the product's [intended] function.' " *American Xyrofin*, 230 Ill. App. 3d at 671-72, 595 N.E.2d at 657 (quoting *Moorman*, 91 Ill. 2d at 97, 435 N.E.2d at 455 (Simon, J., specially concurring)).

> "When characterizing an event as sudden and calamitous the focus is upon 'the suddenness of the *occurrence of an event*—the point when the injury occurs ***—where such occurrence causes personal injury or damage to property external to the defective product which exposes a party to an unreasonable risk of injury to himself or his property, rather than the suddenness or length of time within which the *defect or cause of the occurrence* develops *** and manifests itself in the sudden and calamitous occurrence.' " (Emphases in original.) *American Xyrofin*, 230 Ill. App. 3d at 671-72, 595 N.E.2d at 657 (quoting *United Air Lines, Inc. v. CEI Industries of Illinois, Inc.*, 148 Ill. App. 3d 332, 339, 499 N.E.2d 558, 562 (1986)).

"Additionally, a history of repairs prior to the occurrence does not necessarily detract from its characterization as sudden and calamitous where there is evidence to support the finding that the product failed in a sudden and calamitous manner." *American Xyrofin*, 230 Ill. App. 3d at 672,

595 N.E.2d at 657 (citing *Vaughn v. General Motors Corp.*, 102 Ill. 2d 432, 436-37, 466 N.E.2d 195, 197 (failure of brakes on truck sudden and calamitous even though plaintiff was aware of condition of brakes for 19 months prior to accident)); see *Seegers Grain Co. v. United States Steel Corp.*, 218 Ill. App. 3d 357, 366-67, 577 N.E.2d 1364, 1369-70 (1991) (implosion of grain storage tank sudden and calamitous even though repairs to foundation and access doors of grain storage tank were performed three months prior to occurrence); *United Air Lines*, 148 Ill. App. 3d at 340-341, 499 N.E.2d at 562-63 (roof collapse was sudden and calamitous even though plaintiff was aware of water accumulation resulting from roof leaks); see also *Mars*, 327 Ill. App. 3d at 353, 763 N.E.2d at 436 (the collapse of a building frame during a thunderstorm was a sufficiently sudden and dangerous occurrence to fall within the scope to the exceptions).

¶ 91        As the court explained in *United Air Lines*,

"when a sudden and dangerous event occurs resulting in personal injury or property damage, as well as economic loss, an otherwise qualitative defect, which develops or manifests itself either gradually or suddenly, loses its inflexible classification as such in the realm of the economic loss doctrine, and tort, rather than contract, law is the appropriate remedy for damages caused by the defect." *United Air Lines*, 148 Ill. App. 3d at 340, 499 N.E.2d at 562-63.

¶ 92        In *United Air Lines*, a gradual accumulation of water resulted in a sudden roof collapse, damaging office equipment. Looking to the suddenness of the event causing injury, the court found the event was sudden and calamitous and acted as an exception to the economic loss doctrine. *United Air Lines*, 148 Ill. App. 3d at 339-40, 499 N.E.2d at 562-63. The court further held the fact United Air Lines was aware of the continuing leakage problem was only relevant to

the assumption of the risk or comparative negligence, which was not the issue before the court. *United Air Lines*, 148 Ill. App. 3d at 340, 499 N.E.2d at 563.

¶ 93 Here, FPM pled a sudden fire occurred when one of the ventilators failed. The courts in *Moorman* and *United Air Lines* recognized a fire as a sudden and highly dangerous occurrence, held to be recoverable in tort. *Moorman*, 91 Ill. 2d at 84, 435 N.E.2d at 450; *United Air Lines*, 148 Ill. App. 3d at 338-39, 499 N.E.2d at 561-62; see *American Drug Stores, Inc. v. AT & T Technologies, Inc.*, 222 Ill. App. 3d 153, 155, 583 N.E.2d 694, 696 (1991) ("[A] sudden and calamitous fire may be a proper type of occurrence from which to bring an action in tort ***.").

¶ 94 Despite cases holding a fire is a sudden and dangerous event, applying *Hecktman v. Pacific Indemnity Co.*, 2016 IL App (1st) 151459, ¶ 18, 59 N.E.3d 868, the trial court found the fire was not a sudden and dangerous or calamitous event because the ventilators failed over a period of time. Scandroli argues the same, contending the cause of the event was the condition of the ventilators failing over time instead of the sudden fire.

¶ 95 In *Hecktman*, condominium owners filed a negligence action against entities associated with the construction of their building. The plaintiffs alleged, after they moved into their home in 2009, portions of the hardwood flooring began to bow upward, preventing doors from opening and causing damage. The plaintiffs alleged the cause of the problem was water infiltration caused by (1) inadequate construction of the window system of their units, permitting water to enter the units from the outside and (2) inadequate design, installation, and operation of the HVAC system, which failed to properly remove humidity from the ambient air of the building and the plaintiffs' units. *Hecktman*, 2016 IL App (1st) 151459, ¶¶ 4-5. Specifically noting the plaintiffs alleged their hardwood floors became deformed over time, the appellate

court found the plaintiffs failed to allege a sudden, dangerous, or calamitous event. *Hecktman*, 2016 IL App (1st) 151459, ¶ 18.

¶ 96     We find *Hecktman* distinguishable. There, the event causing damage was a bowing of the floors over time caused by a slow infiltration of water. There was no sudden event such as a flood. Scandroli would have us look to the multiple failures of the ventilators over time to hold *Hecktman* applies, but that is not the fact at issue. Instead, we look at the suddenness of the occurrence of an event at the point when the injury occurred. Here, that was a sudden fire. Indeed, the *Hecktman* court recognized how the case before it differed from such a sudden event, noting that *United Air Lines* held "the gradual accumulation of water that resulted in a *sudden roof collapse* constituted a calamitous event" (emphasis in original) (citing *United Air Lines*, 148 Ill. App. 3d at 340, 499 N.E.2d at 563), and *Electronics Group, Inc. v. Central Roofing Co.*, 164 Ill. App. 3d 915, 918-19, 518 N.E.2d 369, 370-71 (1987), held "a roof leak that caused a substantial amount of water to pour into a warehouse *in [a] single day* was a calamitous event." (Emphasis in original). *Hecktman*, 2016 IL App (1st) 151459, ¶ 18. Here the fire was sudden and dangerous. The next question is whether the event caused personal injury or damage other than to the ventilators themselves.

¶ 97                    2. *Damage to Other Property*

¶ 98     FPM next argues it alleged damage to property other than the ventilators themselves. Meanwhile, Scandroli and Aerovent argue FPM alleged damage that was integrated with the ventilators such that "other property" was not involved.

¶ 99     For the sudden-and-dangerous-event exception to the economic loss doctrine to apply, the sudden and dangerous event must result in personal injury or property damage. *Chicago Flood Litigation*, 176 Ill. 2d at 199-200, 680 N.E.2d at 275. The property damage

cannot relate to the defective product itself—there must be damage to "other property." *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 177 Ill. 2d 21, 41-42, 682 N.E.2d 45, 54-55 (1997). "Simply put, a product that damages only itself cannot be the subject of a suit for damages." *Mars*, 327 Ill. App. 3d at 354, 763 N.E.2d at 436 (2002) (citing *Moorman*, 91 Ill. 2d at 85, 435 N.E.2d at 450 ("[W]here only the defective product is damaged, economic losses caused by qualitative defects falling under the ambit of a purchaser's disappointed expectations cannot be recovered under a strict liability theory.")).

¶ 100    *Chicago Flood Litigation* provides an example of an economic loss that is above and beyond a plaintiff's commercial expectations. There, our supreme court concluded the economic loss doctrine did not bar recovery in tort for the plaintiffs, who lost perishable inventory as a result of interrupted electrical service, finding such a loss was above and beyond the plaintiffs' disappointed commercial expectation in continuous electrical service. *Chicago Flood Litigation*, 176 Ill. 2d at 202, 680 N.E.2d at 276.

¶ 101    In *Trans States Airlines*, our supreme court addressed whether an airplane engine and its airframe constituted two separate products or were so integrated as to be considered a single product. There, an aircraft manufacturer bought an airplane engine from the defendant and incorporated it into one of its airframes. While the aircraft was flying, the engine failed and caught fire, damaging both the engine and the surrounding airframe. In seeking recovery for damages to the airframe, the plaintiff argued the engine was a separate entity from the airframe, and thus, the airframe was "other property." *Trans States Airlines*, 177 Ill. 2d at 23-26, 682 N.E.2d at 46-48.

¶ 102    The court held a product and one of its component parts can constitute two separate products such that a plaintiff may recover in tort when a defect in one causes damage to

the other. *Trans States Airlines*, 177 Ill. 2d at 51, 682 N.E.2d at 59. The court found, to determine whether a defective product caused damage to "other property," the focus must be on the injured party's bargained-for expectation. *Trans States Airlines*, 177 Ill. 2d at 46, 682 N.E.2d at 57. If a party bargained separately for individual components, then those components constitute separate products. *Trans States Airlines*, 177 Ill. 2d at 47, 682 N.E.2d at 57. If a defective component constituting a separate and distinct product causes damage to another component or to the whole, then the plaintiff lost more than it bargained for, and it can recover under a tort theory. *Trans States Airlines*, 177 Ill. 2d at 49-50, 682 N.E.2d at 57-58. However, the court ultimately determined the engine and the airframe was a single product because the plaintiff had bargained for a fully integrated aircraft, rather than for a separate engine and airframe. *Trans States Airlines*, 177 Ill. 2d at 50-51, 682 N.E.2d at 58.

¶ 103    This court applied *Trans States Airlines* in *Mars*. There, the plaintiff brought a negligence suit against a contractor and subcontractors for damages associated with the construction of a warehouse frame that collapsed during a storm. This court found the plaintiff failed to plead damage to property that could be separated from the product itself because the plaintiff bargained for a completed warehouse, which included the damaged frame. In doing so, we noted, "Had the complaint alleged the frame fell and damaged the existing warehouse, or vehicles belonging to [plaintiff], our analysis might be different." *Mars*, 327 Ill. App. 3d at 357, 763 N.E.2d at 439.

¶ 104    Here, FPM alleged the ventilator failures caused extensive damage to other property at the plant, including roof curbs, wood nailers, and belt rooms. It also alleged the plant was required to shut down operations. While there is some indication the ventilators were designed to integrate with the roof, nothing specifies FPM contracted with Scandroli or Aerovent

- 45 -

for roof curbs, wood nailers, or belt rooms. As a result, FPM sought damages for those items and specifically noted it was not seeking damages under a negligence theory for the ventilators themselves. Thus, focusing on the injured party's bargained-for expectation, which, as currently pled, was solely for the ventilation system, we determine FPM adequately pled damage to "other property" so as to bring it under the exception to the economic loss doctrine.

¶ 105                               E. Amendment of the Complaint

¶ 106          Finally, FPM contends the trial court erred in denying it leave to amend its complaint. Given the court's indication it denied the motion for leave to amend due to jurisdictional concerns, and because we reverse and remand this cause for further proceedings, we determine the issue of the previous motion to amend is moot. On remand, FPM will have the opportunity to seek to file an amended complaint, if it chooses, which can be considered by the court under the current circumstances of the case.

¶ 107                               III. CONCLUSION

¶ 108          For the reasons stated, we reverse the trial court's dismissal of counts I, II, V, XI, XII, and XIII of plaintiff's second amended complaint, affirm the court's judgment in all other respects, and remand the cause for further proceedings.

¶ 109          Affirmed in part and reversed in part; cause remanded.